# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 19, 2023              Decided July 30, 2024

No. 21-7127

EXXON MOBIL CORPORATION,
APPELLEE

v.

CORPORACION CIMEX, S.A. (CUBA),
APPELLANT

CORPORACION CIMEX, S.A. (PANAMA) AND UNION
CUBA-PETROLEO,
APPELLEES

———

Consolidated with 22-7019, 22-7020

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:19-cv-01277)

———

*Michael R. Krinsky* argued the cause for appellants/cross-appellees.  With him on the briefs were *Lindsey Frank* and *Nathan Yaffe.*

2

*Steven K. Davidson* argued the cause for appellee/cross-appellant. With him on the briefs were *Shannen W. Coffin, Michael J. Baratz,* and *Michael G. Scavelli.*

*Marco B. Simons, Richard L. Herz*, and *Michelle C. Harrison* were on the brief for *amicus curiae* EarthRights International in support of appellee/cross-appellant.

Before: SRINIVASAN, *Chief Judge*, PILLARD, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge.*

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

SRINIVASAN, *Chief Judge*: Over six decades ago, Exxon owned multiple subsidiaries in Cuba that in turn owned various oil and gas assets. In 1960, the Cuban government expropriated those assets without compensating Exxon.

In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity Act, which furnishes a cause of action against those who traffic in property confiscated by the Cuban government. Exxon brought suit under that Act against three state-owned defendants. Exxon's suit contends that the defendants currently traffic in confiscated property by participating in the oil industry and operating service stations using the property.

One of the defendants unsuccessfully moved to dismiss the complaint based on foreign sovereign immunity. The Foreign Sovereign Immunities Act (FSIA) generally bars United States courts from exercising jurisdiction over foreign sovereign entities like the defendants in this case. The district court held

3

that the Cuban Liberty and Democratic Solidarity Act does not itself overcome a foreign sovereign's general immunity from suit under the FSIA, and that jurisdiction in this case thus depends on the applicability of an FSIA exception. The court determined that the FSIA's expropriation exception does not apply in the circumstances but that the FSIA's commercial-activity exception does.

We agree with the district court that the Cuban Liberty and Democratic Solidarity Act does not confer jurisdiction in this case and that the FSIA's expropriation exception is inapplicable. As for the commercial-activity exception, we conclude that the district court needed to undertake additional analysis before determining that jurisdiction exists under that exception. We thus vacate the district court's decision and remand the case for further analysis on the applicability of the FSIA's commercial-activity exception.

I.

A.

In 1959, Exxon, then known as Standard Oil, owned several subsidiaries in Cuba, including Esso Standard Oil, S.A. (Essosa). After Fidel Castro's rise to power, the Cuban government seized files, maps, and other records of geological exploration from the offices of Standard Oil's subsidiaries, and the subsidiaries ceased all exploration efforts in Cuba. In 1960, the Cuban government issued a series of resolutions expropriating property, including all Cuban property owned by Essosa. The Cuban government prohibited Essosa from operating a refinery, caused it to abandon its Cuba-based marketing operations, and forced it to stop operating its service stations in Cuba. All told, the Cuban government confiscated

4

the refinery, multiple bulk-products terminals, and over one hundred service stations from Standard Oil's subsidiaries.

In 1964, Congress established a mechanism for U.S. nationals to submit expropriation claims against Cuba to the U.S. Foreign Claims Settlement Commission (the Commission). *See* 22 U.S.C. § 1643 *et seq.* Congress tasked the Commission with determining "the amount and validity of claims by nationals of the United States against the Government of Cuba" for "losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property," including claims based on "any rights or interests . . . owned wholly or partially, directly or indirectly." *Id.* § 1643b(a).

In 1969, the Commission certified that Standard Oil had "suffered a loss in the total amount of $71,611,002.90 . . . as a result of the intervention on July 1, 1960, of the Cuban branch of Essosa," and that Standard Oil was also entitled to interest at a rate of 6% per annum. *See* In the Matter of the Claim of Standard Oil Company (F.C.S.C. Decision No. CU-3838 Sept. 3, 1969) at 9, J.A. 60. Neither Standard Oil nor its successor Exxon has received any payment in connection with that certified claim.

B.

Three decades after the Commission certified Standard Oil's claim, Congress enacted the Cuban Liberty and Democratic Solidarity Act of 1996. *See* 22 U.S.C. § 6021 *et seq.* Title III of the Act creates a private right of action enabling U.S. nationals who previously owned property in Cuba to sue any "person" who, after a certain date, "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959." *Id.* § 6082(a)(1)(A). The Act defines

5

a "person" as "any person or entity, including any agency or instrumentality of a foreign state." *Id.* § 6023(11). And the Act broadly defines "traffics": one "traffics" in property by "knowingly and intentionally" taking one of a long list of actions without authorization, such as purchasing, selling, controlling, or using an interest in confiscated property, as well as "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property." *See id.* § 6023(13)(A)(i)–(iii).

The Act's stated purpose in part is to "deter trafficking in wrongfully confiscated property" by giving "United States nationals who were the victims of these confiscations . . . a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11). While Title III provides multiple possible measures of damages, it creates a rebuttable presumption that a claimant is entitled to the amount certified to them by the Commission, in addition to court costs and attorneys' fees. *See id.* § 6082(a)(1)–(2). Title III also provides for treble damages when a claim to property previously certified by the Commission is at issue. *See id.* § 6082(a)(3)(A), (a)(3)(C)(ii).

The Act authorizes the President to suspend Title III's private right of action for periods of up to six months at a time upon determining "that the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." *Id.* § 6085(b). From the time of the Act's enactment, Presidents issued sequential six-month suspensions until 2019, when President Trump's administration announced that it would no longer suspend the right to bring Title III actions. That decision paved the way for this suit.

6

C.

In May 2019, Exxon sued three state-owned defendants: (i) Corporación CIMEX S.A. (Cuba), a conglomerate, whom we will refer to as CIMEX; (ii) Corporación CIMEX S.A. (Panama), whom Exxon alleges is the alter ego of CIMEX; and (iii) Unión Cuba-Petróleo (CUPET), Cuba's state-owned oil company.  Exxon alleges that the defendants traffic in confiscated property by extracting, importing, and refining crude oil, operating service stations, and engaging in commercial activity involving the confiscated property.  *See* Second Am. Compl. ¶¶ 127–35, J.A. 47–48.  Exxon seeks a damages award equaling the amount certified by the Commission, as well as pre-judgment interest and treble damages.  *Id.* ¶ 137, J.A. 48.

The defendants moved to dismiss Exxon's complaint for lack of jurisdiction based on foreign sovereign immunity.  The parties agree that all three defendants are wholly owned by Cuba, rendering them agencies or instrumentalities of a foreign state.  As such, the defendants are "presumptively immune from the jurisdiction of United States courts" under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et seq.*, unless one of the FSIA's exceptions applies.  *See OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 30–31 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).  At issue here are two FSIA exceptions:  the expropriation exception and the commercial-activity exception.  *See* 28 U.S.C. § 1605(a)(2), (a)(3).

The district court denied the motion to dismiss as to CIMEX, but deferred ruling and allowed limited jurisdictional discovery as to the other two defendants.  *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 534 F. Supp. 3d 1, 7 (D.D.C. 2021).  The court began by rejecting Exxon's argument that,

7

regardless of the FSIA, Title III independently confers jurisdiction over the defendants. *Id.* at 11. The court then examined the relevant FSIA exceptions, concluding that the commercial-activity exception is satisfied with respect to CIMEX but that the expropriation exception is unsatisfied with respect to any defendant. *Id.* at 15–22, 26–29. The court later denied the defendants' motion for reconsideration. *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 567 F. Supp. 3d 21 (D.D.C. 2021).

All three defendants now appeal the district court's denial of CIMEX's motion to dismiss for lack of jurisdiction. Exxon cross-appeals the district court's holdings that the FSIA's expropriation exception is unsatisfied and that Title III does not independently confer jurisdiction.

## II.

While we generally lack jurisdiction to review the denial of a motion to dismiss because such an order is interlocutory, we have jurisdiction when the dismissal was sought on grounds of sovereign immunity (including foreign sovereign immunity). *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). We thus possess jurisdiction over CIMEX's appeal from the denial of its motion for dismissal. As for the other two defendants, the district court certified their appeals for interlocutory review as a discretionary matter under 28 U.S.C. § 1292(b), *see Exxon Mobil Corp. v. Corporación CIMEX S.A.*, No. 19-cv-1277, 2021 WL 6805533 (D.D.C. Nov. 23, 2021), and we agree that the statutory standards for interlocutory appeal are satisfied. And when a district court certifies an order for interlocutory appeal under that statute, we can decide "any issue fairly included within the certified order," *Yamaha Motor Corp.,*

8

*U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996), which here includes the issues raised by Exxon in its cross-appeal.

We thus proceed to examine:  (i) Exxon's argument that, regardless of the applicability of any FSIA exception, Title III independently establishes jurisdiction over foreign sovereign entities like the defendants; (ii) Exxon's contention that the FSIA's expropriation exception applies in this case; and (iii) the defendants' submission that the FSIA's commercial-activity exception does not apply.

A.

Exxon initially contends that we need not consider the applicability of any FSIA exception because Title III independently confers jurisdiction over its action against Cuba-owned entities.  The district court, in our view, correctly rejected that contention.

The terms of the FSIA contemplate that jurisdiction in a civil action against a foreign sovereign could arise only under the FSIA itself, not under some other statute like Title III.  To that end, the FSIA prescribes that "a foreign state *shall be immune* from the jurisdiction of the courts of the United States and of the States *except as provided* in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604 (emphasis added); *see also* 28 U.S.C. § 1330(a).  Section 1605 then sets out the FSIA's exceptions to the default bar against jurisdiction over foreign sovereigns—and we will examine two of those exceptions below.  And Section 1607, inapposite here, concerns counterclaims against foreign states who themselves bring an action.

Given the FSIA's terms, the Supreme Court has repeatedly explained that the "Foreign Sovereign Immunities Act

9

'provides the *sole basis* for obtaining jurisdiction over a foreign state in the courts of this country.'" *Sachs*, 577 U.S. at 30 (emphasis added) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Said otherwise, "Congress established [in the FSIA] a comprehensive framework for resolving *any claim* of [foreign] sovereign immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004) (emphasis added). Accordingly, when the Supreme Court recently held that the FSIA does not pertain to criminal cases against foreign sovereigns, the Court reiterated "the 'comprehensiveness' of the statutory scheme as to civil matters" like this case. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (quoting *Amerada Hess*, 488 U.S. at 437).

In short, "[t]hrough the FSIA, Congress enacted a comprehensive scheme governing claims of immunity in civil actions against foreign states and their instrumentalities." *Id.* at 272–73. Consistent with that understanding, our court has described the "FSIA exceptions [as] exhaustive; if none applies to the circumstances presented in a case, the foreign state has immunity and the court lacks subject-matter jurisdiction." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 690 (D.C. Cir. 2022); *see also Simon v. Republic of Hungary*, 77 F.4th 1077, 1090 (D.C. Cir. 2023) ("Absent a pre-existing agreement with the United States affecting the scope of sovereign immunity, a foreign sovereign is generally immune, unless one of the FSIA's enumerated exceptions applies."); *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020).

Exxon nonetheless contends that the FSIA does not set out the exclusive mechanism for securing jurisdiction over civil suits against foreign sovereigns, and that courts have jurisdiction in Title III actions against foreign sovereigns

10

without regard to the FSIA. In support of that proposition, Exxon observes that Title III creates liability for "any person that . . . traffics in property which was confiscated by the Cuban Government," 22 U.S.C. § 6082(a)(1)(A), and defines a "person" as "any person or entity, including any *agency or instrumentality of a foreign state*," *id.* § 6023(11) (emphasis added).

It is true that Title III thereby contemplates that its cause of action can encompass suits against a foreign state (and its agencies or instrumentalities). But Title III nowhere says that *any* Title III action against a foreign state automatically lies within a district court's jurisdiction. Rather, Title III harmoniously coexists with the FSIA if it allows for actions against foreign sovereign entities who traffic in expropriated property in those circumstances in which the FSIA allows for jurisdiction over the foreign sovereign—i.e., when an FSIA exception applies.

After all, Title III speaks in terms of establishing "liability" for persons (potentially including foreign states) who "traffic[] in property which was confiscated by the Cuban Government," *id.* § 6082(a)(1)(A), without saying anything about the existence of jurisdiction over a foreign sovereign. The FSIA, by contrast, specifically addresses when a "foreign state [is] immune from . . . jurisdiction." 28 U.S.C. § 1604. And "whether there has been a waiver of sovereign immunity" and "whether the source of substantive law upon which the claimant relies provides an avenue of relief" are "two 'analytically distinct' inquiries." *FDIC v. Meyer*, 510 U.S. 471, 483–84 (1994) (quoting *United States v. Mitchell*, 463 U.S. 206, 218 (1983)). So, while Title III "provides an avenue of relief" against persons (potentially including foreign states) who traffic in property expropriated by Cuba, that does not tell us "whether there has been a waiver of sovereign immunity"

11

enabling the exercise of jurisdiction over a foreign sovereign sued under Title III.  *See id.*

Congress, moreover, was well aware of the FSIA when it enacted Title III, so much so that it expressly referenced and incorporated FSIA definitions, *see* 22 U.S.C. § 6023(1), (3), and FSIA procedures for service of process, *see id.* § 6082(c)(2).  Conversely, when Congress sought to render FSIA provisions inapplicable to actions under Title III, Congress specifically said so, as it did with respect to the FSIA's delineation of the scope of immunity from attachment or execution.  *See* Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, Pub. L. No. 104–114, § 302(e), 110 Stat. 785, 818 (codified at 28 U.S.C. § 1611(c)).  Title III contains no such language referencing—much less departing from—the FSIA's prescription that "a foreign state shall be immune from the jurisdiction of the courts . . . except as provided in" the FSIA's enumerated exceptions.  28 U.S.C. § 1604.  The absence of any such language in Title III is significant: "Given the FSIA's comprehensive and explicit regulation of jurisdiction over foreign sovereigns, we cannot assume that Congress abrogated these sovereigns' immunity from suit through other statutes" like Title III "without mentioning jurisdiction or their immunity expressly."  *Doe v. Taliban*, 101 F.4th 1, 10 (D.C. Cir. 2024).  Indeed, even if Title III were ambiguous on whether it abrogates foreign sovereign immunity, "any statutory ambiguity concerning a waiver of foreign immunity outside the FSIA must be resolved in favor of its preservation."  *Id.* at 12.

Our dissenting colleague suggests that if Congress understood the FSIA to apply to Title III, it would not have needed to specify the applicability of various FSIA provisions in Title III actions.  Dissenting Op. 9.  As alluded to above, however, when enacting Title III, Congress amended the FSIA

12

to provide that, "[n]otwithstanding" the FSIA's exceptions to a foreign sovereign's immunity from attachment and execution, in Title III actions "the property of a foreign state shall be immune from attachment and from execution" in certain conditions. 28 U.S.C. § 1611(c) (citing 28 U.S.C. § 1610). Congress would expressly provide that an FSIA exception to FSIA-created immunity is inapplicable in Title III actions only if Congress understood foreign states to enjoy FSIA immunity in Title III actions in the first place. True, that provision specifically concerns FSIA execution immunity (as opposed to FSIA jurisdictional immunity) in Title III cases. *See* Dissenting Op. 9. But if Congress in fact wanted Title III plaintiffs to secure judgments against foreign states without needing to surmount FSIA jurisdictional immunity—as our dissenting colleague supposes—then it is hard to see why Congress still forced those same plaintiffs to overcome FSIA execution immunity to collect on those same judgments.

Nor are we persuaded by our colleague's reliance on the Supreme Court's decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), in support of the proposition that Title III's conferral of liability on foreign governments also effected an abrogation of their otherwise-applicable jurisdictional immunity under the FSIA. *See* Dissenting Op. 5–7. *Kirtz* held that the Fair Credit Reporting Act (FCRA) waived the federal government's (domestic) sovereign immunity because the "'statute creates a cause of action' and explicitly 'authorizes suit against a government on that claim.'" 601 U.S. at 49 (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro De Periodismo Investigativo, Inc.* (*FOMB*), 598 U.S. 339, 347 (2023)). In reaching that conclusion, the Court adopted the approach it has long taken when considering the sovereign immunity of domestic states. *See, e.g.*, *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 726 (2003); *Kimel v. Fla. Bd. of Regents*, 528

13

U.S. 62, 73–74 (2000); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56–57 (1996).

Our colleague observes that, like the FCRA, Title III also imposes liability on any "person" and defines "person" to include a government agency or similar entity. *See Kirtz*, 601 U.S. at 51; *compare* 22 U.S.C. § 6023(11) ("any agency or instrumentality of a foreign state"), *with* 15 U.S.C. § 1681a(b) ("any . . . governmental subdivision or agency, or other entity"). But we believe it is mistaken to rely on that similarity alone to conclude that Title III likewise both confers a cause of action against foreign states and abrogates their sovereign immunity.

To begin with, *Kirtz* and the line of cases preceding it concerned either federal or state sovereign immunity, which derive from different sources than does foreign sovereign immunity. Whereas federal and state sovereign immunity stem from the common law and the Constitution, respectively, *see Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021); *Alden v. Maine*, 527 U.S. 706, 712–13 (1999); *Shuler v. United States*, 531 F.3d 930, 932–33 (D.C. Cir. 2008), foreign sovereign immunity is "a matter of grace and comity" extended to foreign states by our political branches, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486–88 (1983); *Altmann*, 541 U.S. at 689, 696. So a host of "sensitive diplomatic and national-security judgments . . . pervade waivers of foreign sovereign immunity," bolstering the need to respect Congress's balancing of those considerations in the provisions of the FSIA. *Doe v. Taliban*, 101 F.4th at 12. Those sorts of foreign-relations concerns do not arise in cases involving federal or state sovereign immunity.

Additionally, when the Supreme Court has held that Congress waived or abrogated immunity in cases involving

14

federal or state sovereign immunity, it was not just because the statute created a cause of action and authorized suit against a government (as Title III also does). Instead, the Court deemed immunity waived or abrogated because "recognizing immunity would have negated" the conferral of a cause of action against governments *entirely*, as any and all "suits allowed [by the statute] against governments would automatically have been dismissed" on sovereign-immunity grounds. *FOMB*, 598 U.S. at 348; *see Kirtz*, 601 U.S. at 49–51. In other words, unless the statute creating the cause of action were construed to waive sovereign immunity, the conferral of a cause of action against the government would have been completely pointless. That is not the case here. Our holding that Title III does not independently abrogate FSIA immunity does *not* entirely "negate" the Title III cause of action against foreign governments: Title III suits against those governments can proceed if an FSIA exception applies.

The upshot is that plaintiffs bringing Title III actions against foreign states must satisfy one of the FSIA's exceptions, which is the same condition any litigant seeking to sue a foreign sovereign must meet. That approach, contrary to Exxon's submission, does not undermine Title III's purposes. It poses no obstacle to Title III suits against non-sovereign parties who traffic in confiscated property. And with respect to Title III actions against foreign sovereigns, insofar as Congress intended for such suits to go forward only when the FSIA allows for jurisdiction, as we believe to be the case, our reading of course furthers—rather than frustrates—Congress's intentions. That conclusion respects Congress's decision to craft the FSIA as a "careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208–09 (2018).

15

B.

Because Exxon's Title III action is subject to the FSIA's "baseline principle of immunity for foreign states and their instrumentalities," the action must fit within one of the FSIA's "exceptions to that principle." *Turkiye Halk Bankasi*, 598 U.S. at 272. Exxon "bears the initial burden to overcome" the FSIA's "presumption of immunity . . . by producing evidence that an exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). The defendants then "bear[] the ultimate burden of persuasion to show the exception does not apply." *Id.*

Exxon submits that its suit satisfies two FSIA exceptions: the expropriation exception and the commercial-activity exception. We agree with the district court that the expropriation exception is inapplicable. With respect to the commercial-activity exception, while the district court considered that exception to apply, we remand for further assessment of whether CIMEX's use of expropriated property causes the requisite direct effect in the United States.

Before turning to an examination of each of the two exceptions relied on by Exxon, we pause briefly to consider a threshold theory advanced by the defendants: that because this case arises out of Cuba's act of expropriating property, the only FSIA exception potentially in play is the expropriation exception, such that the commercial-activity exception could not separately supply a basis for jurisdiction.

Nothing in the FSIA supports that kind of one-and-only-one-exception approach. The FSIA sets out a list of exceptions enumerating various circumstances in which a "foreign state shall not be immune from the jurisdiction of courts," and those

16

exceptions are framed as alternatives, separated by the word
"or." *See* 28 U.S.C. § 1605(a). The most natural reading is
that, if any of those exceptions applies in a given case,
immunity is overcome. There is no textual (or other) indication
that a court must first somehow determine which exception is
the sole one possibly in play in any given case, and then should
limit itself to examining whether that—and only that—
exception applies. Indeed, it is unclear how a court would
evaluate which of two (or more) exceptions is most germane
without proceeding to assess whether each exception's
requirements are satisfied—the very inquiry the defendants
suggest should not happen.

Our court accordingly has "never held that in order to
proceed against a foreign government, a claim must fall into
just one FSIA exception." *De Csepel v. Republic of Hungary*,
859 F.3d 1094, 1103 (D.C. Cir. 2017). In fact, with specific
regard to the expropriation and commercial-activity
exceptions, we have explained that they involve "altogether
different questions." *Id.* We thus rejected the idea that an
activity must fall under "either the expropriation exception or
the commercial activity exception, but not both." *Id.* As long
as "a proper showing is made," a plaintiff can rely on the
commercial-activity exception even if a case may involve "the
taking of property"—i.e., an expropriation. *Foremost-
McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450
n.15 (D.C. Cir. 1990) (internal quotation marks omitted).

1.

We first consider the expropriation exception. As relevant
here, that exception abrogates immunity in any case "in which
rights in property taken in violation of international law are in
issue and . . . that property or any property exchanged for such
property is owned or operated by an agency or instrumentality

17

of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). "Generally speaking, the exception has two requirements: (1) the claim must put in issue 'rights in property taken in violation of international law,' and (2) there must be an adequate connection between the defendant and both the expropriated property and some form of commercial activity in the United States." *Simon*, 77 F.4th at 1091 (quoting 28 U.S.C. § 1605(a)(3)).

The first of those requirements is dispositive here. In determining whether a claim involves rights in property that are recognized by and taken in violation of international law, courts look to the "customary international law of expropriation" (if the plaintiff "do[es] not rely on an express international agreement"). *Id.* at 1097. Such a plaintiff thus "must show that [its] legal theory 'has in fact crystallized into an international norm that bears the heft of customary law.'" *Id.* (quoting *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 449 (D.C. Cir. 2018)); *see Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 180–81 (2021).

We agree with the district court that Exxon has failed to allege any "rights in property taken in violation of international law." 28 U.S.C. § 1605(a)(3). Exxon does not contend that it directly owned any of the property seized by Cuba. The seized property instead was owned by Exxon's subsidiary, Essosa. Exxon's asserted property right, then, is its interest, as a shareholder and parent of Essosa, in Essosa's property. And under the international law of expropriation, "not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation of the shareholder's ownership rights." *Helmerich*, 743 F. App'x at 454. Because a "shareholder's direct rights generally are not implicated by

18

state action that depreciates the value of a corporation's shares, even severely," shareholders typically cannot establish a violation of their rights on the basis of such state action unless the action is aimed at the direct rights of the shareholders themselves. *See id.* (quoting Br. for the United States as Amicus Curiae at 12–13, *Helmerich*, 743 F. App'x 442 (No. 13-7169)).

Decisions by the International Court of Justice confirm that international law generally does not recognize a shareholder's right in property owned by the corporation. As that court has explained, there is "a firm distinction between the separate entity of the company and that of the shareholder," and "[s]o long as the company is in existence[,] the shareholder has no right to the corporate assets." *The Barcelona Traction, Light & Power Co. (Belgium v. Spain)*, Judgment, 1970 I.C.J. 3, 35, ¶ 41 (Feb. 5). That understanding governs even in the case of a shareholder who is the sole owner of the subsidiary. *See Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)*, Judgment, 2010 I.C.J. 640, 688, ¶ 151, 689–90, ¶¶ 155–56 (Nov. 30).

Exxon insists that other sources of international law recognize its shareholder interest in Essosa's assets as a property right. The scattered authorities Exxon cites, however, are secondary to the judgments of the International Court of Justice, which are "accorded great weight" in understanding the content of international law. *See* Restatement (Third) of the Foreign Relations Law of the United States § 103 cmt. b (Am. L. Inst. 1987) (Third Restatement). At any rate, even on their own terms, the sources Exxon cites do not support its position.

Two of the sources—decisions by the Iran-United States Claims Tribunal and investor-state arbitration decisions—tell us little about the customary international law of expropriation.

19

The Tribunal's decisions involve "specific, bargained-for agreements" subject to governing law distinct from customary international law.  *See Helmerich*, 743 F. App'x at 452 (citing Third Restatement § 102(2)).  One Tribunal decision, for example, explains that the State Department had specifically bargained with Iran for a broader definition of property that extended to interests in property.  *See SEDCO, Inc. v. Nat'l Iranian Oil Co. & Islamic Republic of Iran*, 15 Iran-U.S. Cl. Trib. Rep. 23 (1987), 1987 WL 503885, at *8 n.9.  Investor-state arbitration decisions likewise involve negotiated Bilateral Investment Treaties whose terms do not necessarily reflect the parameters of customary international law.  *See, e.g.*, *Total S.A. v. The Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Objections to Jurisdiction, ¶ 78 (Aug. 25, 2006) (distinguishing bilateral investment treaties from customary international law).  Exxon's reliance on a third source—the Commission's certification of Exxon's claim—falls short for similar reasons:  Congress authorized the Commission to certify losses due to the expropriation of "property including any rights or interests therein owned wholly or partially, directly or indirectly," *see* 22 U.S.C. § 1643b(a), a definition of property that sweeps substantially broader than the one recognized by our decision in *Helmerich* and by the International Court of Justice's decisions.

To be sure, there is an exception to the general rule under customary international law that shareholders lack a property right in the assets of entities in which they hold ownership interests.  As we recognized in *Helmerich*, if a state's action "'is aimed at the direct rights of the shareholder as such,' it can form the basis for an international expropriation claim."  743 F. App'x at 454 (quoting *Barcelona Traction*, 1970 I.C.J. at 36, ¶ 47).  That can occur if the state action "completely destroy[s] the beneficial and productive value of the shareholder's ownership of their company," "leaving the shareholder with

20

shares that have been rendered useless." *Id.* (quoting Supp. Br. for the United States as Amicus Curiae at 12, *Helmerich*, 743 F. App'x 442 (No. 13-7169)).  In *Helmerich*, for example, we concluded that a parent company had adequately alleged that a foreign sovereign had taken its rights in property in violation of international law because the takings, while aimed at the subsidiary, had destroyed the entire value of the parent company's shares. *Id.* at 455.

That exception is inapplicable here.  Unlike in *Helmerich*, the district court here found undisputed evidence that Essosa has continued its operations.  The defendants produced documents demonstrating that Essosa continued to hold annual shareholder meetings and Board of Directors meetings, operated fuel stations as of 2011, and began operating under a different name in 2012 that is listed as in good standing with the Public Registry of Panama.  *See* Frank Decl. ¶¶ 2–19, J.A. 323–33.  Exxon has not alleged any clear error in the district court's factual findings, and there is no evidence that Exxon's shares in Essosa were "rendered useless," *Helmerich*, 743 F. App'x at 454, by Cuba's expropriation of Essosa's property. And while Exxon contends in its reply brief in our court that Cuba in fact destroyed the entire value of Essosa's operations, we have no occasion to consider that argument:  Exxon forfeited the argument twice over by failing to raise it in the district court or in our court in its opening brief.  *See Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008); *Abdullah v. Obama*, 753 F.3d 193, 199–200 (D.C. Cir. 2014).

Finally, our dissenting colleague suggests that the foregoing analysis is misplaced because the U.S. Foreign Claims Settlement Commission long ago effectively settled that Exxon itself has a legally cognizable interest in the expropriated property.  *See* Dissenting Op. 8.  Title III requires that if the Commission certifies "a claim to ownership of [an]

21

interest" in property, courts "shall accept" that certification "as conclusive proof of ownership of [that] interest." 22 U.S.C. § 6083(a)(1).  And because the Commission determined that Cuba unlawfully took Exxon's property rights, our colleague reasons, we are bound to treat Exxon's ownership of those property rights as conclusive of Exxon's property interests.  We do not see things the same way.

It is true that the statute establishing the Commission charged it with determining "the amount and validity of claims" "in accordance with applicable substantive law, including international law." 22 U.S.C. § 1643b(a).  But the statute also directs the Commission to determine claims "for losses resulting from the . . . expropriation [of] . . . property including any rights *or interests* therein owned wholly or partially, directly *or indirectly* at the time by nationals of the United States." *Id*. (emphasis added).  As the district court observed, the Commission thus evaluated property interests much broader than those recognized under customary international law.  *See Exxon*, 534 F. Supp. 3d at 29.  And there is no evidence that the Commission purported to evaluate property claims based on customary international law.  The Commission's certification, then, cannot resolve whether the expropriation exception applies.

In sum, because Exxon does not assert a right recognized by the international law of property, it cannot satisfy the expropriation exception.  Exxon submits that Cuba not only expropriated property but intentionally discriminated against U.S. nationals in doing so, thereby ostensibly running afoul of international law's prohibition on discriminatory takings.  But even if that were so, Exxon still could not meet the expropriation exception's requirements:  a successful claim of a discriminatory taking of property requires both discrimination and a taking of property in violation of

22

international law.  The latter is absent here for the reasons explained.

2.

The commercial-activity exception—the "most significant of the FSIA's exceptions"—strips sovereign immunity on the basis of a foreign sovereign's commercial activities.  *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992); 28 U.S.C. § 1605(a)(2).  The exception abrogates immunity in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  At issue here is the third clause, which withdraws immunity when a suit is "(1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the defendant] outside this country; and (3) that 'cause[d] a direct effect in the United States.'"  *Weltover*, 504 U.S. at 611 (first and third alterations in original) (quoting *id.*).

There is no dispute that Exxon's suit fulfills the first requirement, as CIMEX's alleged trafficking occurs in Cuba.  The parties dispute whether Exxon's suit satisfies the second and third requirements—namely, whether CIMEX's actions are taken in connection with a commercial activity and whether

23

they cause a direct effect in the United States. We conclude that Exxon's suit meets the second requirement because trafficking in confiscated property for purposes of Title III constitutes commercial activity under the FSIA. We vacate and remand, however, for the district court to further assess whether, under the third requirement, CIMEX's actions cause a direct effect in the United States.

a.

In applying the commercial-activity exception, "[w]e begin our analysis by identifying the particular conduct on which the [plaintiff's] action is 'based' for purposes of the Act." *Nelson*, 507 U.S. at 356. We look to "the 'basis' or 'foundation' for a claim," or the "gravamen of the complaint," which generally accounts for "those elements . . . that, if proven, would entitle a plaintiff to relief." *Sachs*, 577 U.S. at 33–34 (alteration in original) (quoting *Nelson*, 507 U.S. at 357).

The relevant clause of the commercial-activity exception requires that the gravamen of the complaint bear a connection to "commercial activity," which the FSIA defines as "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The statute further instructs that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.*; *see also Weltover*, 504 U.S. at 614. While the statute's definition "leaves the critical term 'commercial' largely undefined," the following principle guides our inquiry: "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Weltover*, 504 U.S. at 612, 614. In *Weltover*, for

24

example, the Supreme Court concluded that because sovereign bonds are "garden-variety debt instruments" that could "be held by private parties," could "be traded on the international market," and "promise[d] a future stream of cash income," Argentina's issuance of those bonds constituted commercial activity under the FSIA. *Id.* at 615.

The gravamen of Exxon's suit is plainly connected to commercial activity. Exxon alleges that CIMEX processes remittances (transfers of money) sent by U.S. residents to Cuba and that it operates service stations that sell gas and consumer goods. Running retail and financial-services operations is not uniquely sovereign activity, as any private actor can also engage in those functions. In performing those activities, then, the Cuban government acts not as a "regulator of a market," but rather "in the manner of a private player." *See id.* at 614.

The defendants resist that conclusion by contending that the gravamen of Exxon's suit is the original expropriation and possession of the confiscated property rather than the subsequent commercial activity of processing remittances and selling goods. According to the defendants, allowing later commercial use of confiscated property to meet the FSIA's commercial-activity exception would enable an end-run around the expropriation exception by permitting plaintiffs to shoehorn suits about sovereign expropriations into the commercial-activity exception.

The fact that Cuba's antecedent expropriation and the defendants' possession of Exxon's property may have enabled the challenged commercial activity, however, does not diminish the applicability of the commercial-activity exception. The Supreme Court has repeatedly distinguished enabling conduct preceding a claim from activity forming the basis of the claim.

25

*Nelson*, for instance, involved tort claims for injuries a person sustained from a foreign sovereign's imprisonment and torture of him.  507 U.S. at 353–54.  He alleged that the defendants had retaliated against him for reporting safety violations at a state-owned hospital where he worked.  *Id.* at 362.  The Court explained that, even if the defendants had engaged in commercial activity when they "recruited [the plaintiff] for work at the hospital, signed an employment contract with him, and subsequently employed him," it was the subsequent "torts, and not the arguably commercial activities that preceded their commission," that "form[ed] the basis" of the suit.  *Id.* at 358.

Similarly, in *Sachs*, a person bought a European rail pass while in the United States and later suffered injuries when attempting to board a train using that pass in Austria.  577 U.S. at 29.  The Court assessed whether, for purposes of the commercial-activity exception, the claim was "based upon a commercial activity carried on in the United States by [a] foreign state."  *Id.* (alteration in original) (quoting 28 U.S.C. § 1605(a)(2)).  In rejecting the plaintiff's argument that the rail's sale of the pass to her in the United States satisfied the exception, the Court again separated the antecedent commercial activity from the subsequent, allegedly injurious activity, concluding that the gravamen of the suit occurred in Austria, not the United States.  *Id.* at 35–36.

As those decisions instruct, the inquiry turns on the specific conduct forming the basis of the plaintiff's action.  So here, even if Cuba's original expropriation and the defendants' current possession were in some sense necessary to enable the subsequent trafficking, the gravamen of Exxon's action under Title III—the trafficking—is commercial activity.  A court must "zero[] in on the core of [the plaintiff's] suit," that is, the

26

"acts that actually injured" the plaintiff. *Id.* at 35. Here, then, we focus on the core of the suit brought by Exxon: the commercial use of confiscated property, which Congress has deemed actionable under Title III.

Our decisions in *Rong v. Liaoning Province Government*, 452 F.3d 883 (D.C. Cir. 2006), and *Ivanenko v. Yanukovich*, 995 F.3d 232 (D.C. Cir. 2021), lend no support to the defendants. While both decisions held that the plaintiffs' suits did not satisfy the commercial-activity exception's requirements, the core of the suit in those cases, unlike here, was an antecedent act of expropriation, not subsequent commercial activity. *See Rong*, 452 F.3d at 887; *Ivanenko*, 995 F.3d at 239. The defendants' reliance on various decisions from foreign tribunals fails for similar reasons: the claims in those cases focused on the wrongful expropriation of property rather than the unlawful commercial use of the property.

The defendants relatedly submit that the alleged trafficking is inseparable from Cuba's exercise of sovereign authority to nationalize property, publicly control industry, and establish a socialist economy, ostensibly rendering the trafficking non-commercial in nature. The terms of the FSIA, though, prescribe that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). It is therefore irrelevant whether "the foreign government is acting . . . with the aim of fulfilling uniquely sovereign objectives"; "[r]ather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (internal quotation marks omitted); *see also Nelson*, 507 U.S. at 360 ("[W]hether a state acts 'in the manner of' a private party is a question of

27

behavior, not motivation.")  And because private parties can equally engage in the types of actions in which Exxon contends the defendants are engaged, the defendants' challenged actions are properly characterized as taken "in connection with a commercial activity."  *See* 28 U.S.C. § 1605(a)(2).

b.

To fit within the commercial-activity exception, CIMEX's trafficking activity not only must bear a "connection with a commercial activity" in Cuba but must also "cause[] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  "[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'"  *Weltover*, 504 U.S. at 618 (second alteration in original) (citation omitted).  Although "jurisdiction may not be predicated on purely trivial effects in the United States," there is no "unexpressed requirement of 'substantiality' or 'foreseeability.'"  *Id.*

The district court concluded that CIMEX causes a direct effect in the United States in two ways:  first, by operating a remittances business that enables transfers of money from the United States to recipients in Cuba; and second, by selling goods imported from the United States at its convenience stores.  We agree with Exxon and the district court that the types of effects Exxon alleges—outflows of money from the United States and purchases of U.S. goods—can constitute direct effects in the United States.  Still, we vacate and remand for the district court to further assess whether CIMEX "causes" those effects and whether the effects are sufficiently "direct."

i.

We first consider CIMEX's remittances business.  A remittance is initiated when a U.S. resident designates a

28

recipient in Cuba and makes a payment to Western Union. Valmaña Decl. ¶ 13(a)–(b), J.A. 195.  The recipient in Cuba can then collect the remittance at any of 502 Western Union locations in the country.  *Id.* ¶¶ 12, 13(d)–(e), J.A. 194, 196. Exxon estimates that Cuba received $3.6 billion in remittances in 2018, and that 90% of those remittances came from the United States.  Second Am. Compl. ¶ 112, J.A. 43.  CIMEX operates service stations that process remittance payments from the United States through Western Union, and of the 502 Western Union locations in Cuba, 276 are operated by CIMEX and 66 are specifically located at CIMEX's service stations. Valmaña Decl. ¶ 12, J.A. 194.

Exxon contends that CIMEX's remittances business causes a direct effect in the United States by creating a market for remittances and drawing money from the United States to Cuba.  We agree that causing a non-trivial outflow of money from the United States to Cuba would amount to a "direct effect" under the FSIA.  In *Weltover*, the Supreme Court concluded that Argentina's unilateral rescheduling of certain bond payments caused a "direct effect" in the United States. 504 U.S. at 618–19.  The bondholders had "designated their accounts in New York as the place of payment" and Argentina had already "made some interest payments into those accounts before announcing that it was rescheduling the payments." *Id.* at 619.  The Court held that Argentina's "rescheduling of those obligations necessarily had a 'direct effect' in the United States" because "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id. Weltover* indicates that a change in the flow of money in the United States constitutes a direct effect.

Our court has similarly found the existence of a direct effect when a defendant alters the flow of money within, out of, or into the United States.  In one case, we found a direct

29

effect in the United States when "an American corporation transferr[ed] $28,000 from a New York bank to the Somali government's D.C. bank." *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1004 (D.C. Cir. 1985). In another case, the termination of a contract constituted a direct effect because "revenues that would otherwise have been generated in the United States were 'not forthcoming.'" *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010) (quoting *Weltover*, 504 U.S. at 619); *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188–90 (D.C. Cir. 2003) (finding direct effect when defendants failed to make promised payment into Virginia bank account). Here, Exxon claims that money that otherwise would have remained in the United States was transferred to Cuba in the form of remittances. Evidence that CIMEX caused such transfers would demonstrate a direct effect in the United States.

The defendants argue that the effect is indirect because it rests on the intervening decisions of multiple third parties: people in the United States must decide to send remittances to Cuba through Western Union, and the intended recipients in Cuba must decide to receive the remittances at stations operated by CIMEX. We have explained that a direct effect is one that "has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (citation and internal quotation marks omitted). And in the defendants' view, the integral role of third-party transferors and recipients means the effect of CIMEX's remittances business in the United States is not "an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (alteration in original) (citation and internal quotation marks omitted).

30

When the involvement of third parties is an entirely foreseeable (and even intended) consequence of the defendants' relevant actions, however, it will not stand in the way of concluding that the defendants' activity causes a direct effect in the United States. In *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 342–43 (D.C. Cir. 2018), a Brazilian state-owned oil company secured funding for an oil exploration project from various U.S. investors including EIG Management Company, LLC. After an extensive bribery scheme came to light, "skittish lenders withdrew their support," rendering EIG's shares in the project worthless. *Id.* at 343. EIG brought fraud-related claims against the state-owned oil company and other defendants, asserting direct effects based on the concealment of fraud and mismanagement of its money. *Id.* at 343, 345. We held that the suit satisfied the commercial-activity exception, rejecting the defendants' argument that it was the third-party lenders' decisions to withdraw their support, rather than the defendants' fraud, that caused the direct effect in the United States. *Id.* at 346. We refused to adopt a "highly restrictive causation requirement under which contributing factors *readily and predictably caused* by the defendant's same act would preclude jurisdiction." *Id.* (emphasis added).

As in *EIG*, third parties' decisions to send and receive remittances originating from the United States are "readily and predictably caused by" CIMEX's operation of a remittances business. An entity that operates a remittances business knows full well—and indeed, intends—that people in one location will use the service to send money to recipients in another location. And just as in *EIG*, CIMEX appears to have "specifically targeted" parties in the United States. *See id.* at 342. In part due to U.S. regulations, the only remittances "currently being paid out in Cuba" via Western Union are remittances that originated in the United States. *See* Valmaña

31

Decl. ¶ 14, J.A. 199. As such, "CIMEX's entire remittance business is aimed at bringing money from the United States into Cuba." *Exxon*, 534 F. Supp. 3d at 20. For the same reasons, the presence of FINCIMEX, a third-party agent who acts as an intermediary between CIMEX and Western Union, does not preclude finding that CIMEX caused direct effects in the United States: FINCIMEX and CIMEX contract with each other for the very purpose of carrying out a remittances business. *See* Valmaña Decl. ¶ 6, J.A. 193.

Contrary to the defendants' suggestion, the relevant acts can cause a direct effect in the United States regardless of whether the "locus of the tort" or a "legally significant act" occurred in the United States. A "foreign locus does not always mean that a tort causes no 'direct effect' in the United States." *EIG*, 894 F.3d at 347. Nor must the alleged direct effect cause an injury or a harm, as "[n]othing in the FSIA requires that the 'direct effect in the United States' harm the plaintiff." *Cruise Connections*, 600 F.3d at 666 (quoting 28 U.S.C. § 1605(a)(2)). And although the defendants note that we have often found direct effects when the parties had been engaged in commercial dealings, a preexisting relationship of that kind is not a prerequisite to finding a direct effect.

The defendants, though, do raise one point that precludes us from deciding at this stage that CIMEX's processing of remittances causes a direct effect in the United States in the form of outflows of money from the United States to Cuba. The defendants have provided evidence that, of the 66 stations CIMEX uses to process remittances, a maximum of four to ten stations sit on confiscated property formerly owned by Essosa. Valmaña Decl. ¶ 12, J.A. 195. Because Title III makes the defendants liable only for trafficking in confiscated property, the pertinent inquiry is whether CIMEX's remittances operations at the four to ten stations located on former Essosa

32

property cause a direct effect in the United States—not whether CIMEX's entire remittances business does so.

For example, it is possible that precisely the same amount of remittances would be sent from the United States to Cuba even if those four to ten stations did not exist. There is no evidence in the record about any of those individual stations, where they are located, or how much they process in remittances. Given that there are 502 Western Union locations in Cuba, it is possible that, even without the four to ten stations on former Essosa property, Americans would still send the same amount of money and Cuban recipients would still withdraw the same amount of money from other readily accessible stations. If that were the case, one would be hard pressed to conclude that CIMEX's operation of a remittances business at those stations "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The effect would be the same regardless of those stations. *Cf. Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013) (noting that an action cannot be a but-for "cause of an event if the particular event would have occurred without" the action (citation omitted)).

Exxon maintains that the limited number of stations is irrelevant because the amount of remittances those stations likely process exceeds the threshold of triviality under *Weltover*. But whether an effect is too trivial to count as a direct effect under the FSIA is a distinct question from whether a defendant's activity can be said to *cause* that effect, trivial or not. If, as things currently stand, there are readily available substitutes for the processing of remittances at those four to ten stations—for instance, other Western Union sites in the immediate vicinity—the conduct of the business at those stations may not ultimately cause any outflow of money from the United States that would not already occur. Without any examination of that issue, we cannot say whether CIMEX's

33

conduct of a remittances business on confiscated property in fact "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

We vacate and remand for the district court to assess whether CIMEX's conduct of a remittances business at the four to ten stations operated on former Essosa property, as opposed to CIMEX's remittances activity writ large, causes a direct effect in the United States. We do not suggest that courts invariably must splinter jurisdictional inquiries under the FSIA and conduct them parcel-by-parcel. But here, the relevant inquiry concerns only the four to ten stations on former Essosa property because Title III makes it unlawful to traffic in confiscated property, limiting the relevant jurisdictional inquiry to those sites. Our decision should not be understood to express any prediction in either direction on whether CIMEX's remittances business at the four to ten stations causes a direct effect in the United States. Because the district court has not examined that question, we remand for it to conduct the inquiry and reach a conclusion in the first instance.

ii.

In addition to CIMEX's remittances business, Exxon submits that CIMEX's sale of imported U.S. goods at its stations satisfies the commercial-activity exception. According to Exxon, CIMEX's sale of those goods causes a direct effect in the United States by stimulating demand for U.S. goods and by moving capital into and goods out of the United States.

We agree with Exxon that an inflow of capital and an outflow of goods constitutes a direct effect in the United States. The defendants respond, however, that the way in which CIMEX obtains imported goods from the U.S. precludes

34

concluding that CIMEX caused the effect in the United States. Specifically, rather than directly importing goods from the United States, CIMEX orders products through another Cuban company, Alimport, which exercises sole discretion in determining the source location of the goods it sends on to CIMEX.  In the defendants' view, Alimport's role as a third-party intermediary presents an "intervening element" that prevents any effect in the United States from "flow[ing] in a straight line without deviation or interruption" from CIMEX's sales.  *Princz*, 26 F.3d at 1172 (citation and internal quotation marks omitted).

Alimport is the exclusive importer in Cuba of foodstuffs from the United States, meaning that all U.S. goods on CIMEX's shelves are procured through Alimport.  *See* Second Valmaña Decl. ¶ 6, J.A. 2039–40.  Alimport appears to make entirely independent decisions about the source country of the goods it imports.  The defendants represent that CIMEX "does not give any direction to Alimport about the country from where the products should be sourced, the companies from which the products should be purchased, or the brands of a product," and Alimport "decides all this on its own" and "not . . . as an agent of CIMEX (Cuba)."  *Id.*, J.A. 2040.  A report submitted into the record indicates that Alimport "has wide discretion to choose the foreign companies and countries from which to make food purchases."  U.S. Int'l Trade Comm'n, U.S. Agricultural Sales to Cuba:  Certain Economic Effects of U.S. Restrictions at 1-5 (2007), J.A. 1604.  Considerations that influence Alimport's buying decisions include economic factors, such as "the availability of bartering and credit financing," "[p]urchase price, transportation cost, quality, and delivery considerations," along with non-economic factors such as "political motivations."  *Id.* at 2-13, J.A. 1620.  The report even suggests that Alimport may decline to source from the United States altogether if U.S. "laws or

35

regulations" make it "unavailable" as a supplier.  *See id.*  That suggestion indicates that Alimport's decision to import goods for CIMEX from the United States is not a foregone conclusion.

To be sure, CIMEX and Alimport agree on the specific types and amounts of products that Alimport will procure for CIMEX.  *See Exxon*, 534 F. Supp. 3d at 21 (citing Second Valmaña Decl. ¶ 6, J.A. 2040).  But the record indicates that CIMEX never specifies that Alimport must buy goods from the United States, meaning Alimport's decision to purchase U.S. goods is unrelated to any direction from CIMEX.  The defendants' declaration states that CIMEX does not specify even the "brands of a product" when placing an order through Alimport.  Second Valmaña Decl. ¶ 6, J.A. 2040.  On that understanding, Alimport is the key player causing a "direct effect in the United States," 28 U.S.C. § 1605(a)(2), and the purchase of U.S. goods at CIMEX stations is not an "immediate consequence of" CIMEX's "activity."  *See Weltover*, 504 U.S. at 618 (citation omitted).  Insofar as the sale of U.S. goods by CIMEX occurs only because Alimport opts to purchase the products from the United States without input or encouragement from CIMEX, CIMEX would not cause the direct effect in the United States.

CIMEX, however, might still be said to cause a direct effect in the United States if it has sufficient and continuing awareness that the goods it receives from Alimport originate from the United States—in other words, if CIMEX knows it is all but ordering U.S. goods when it places an order with Alimport.  Such knowledge would suggest that, by ordering goods through Alimport, CIMEX causes a "direct effect" by inducing the purchase of what it knows and anticipates would be U.S. goods, even if CIMEX does not specifically request the country of origin.  The subsequent inflow of money, outflow of

36

goods, and stimulation of demand in the United States would then be fairly characterized an "immediate consequence" of CIMEX's decisions to continue procuring goods through Alimport and to sell those goods on confiscated property. *See id.*; *cf. Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994) (Wald, J., concurring) (suggesting that a failure to make a payment could have a direct effect in the United States if there were a "longstanding consistent customary practice" of payments using New York bank accounts). For example, if Alimport supplies CIMEX with U.S. goods year after year, and if CIMEX knows and continuously approves of that pattern, CIMEX would be unable to insulate itself from the jurisdiction of our courts by invoking Alimport's role as an intermediary.

On remand, the district court may find evidence that CIMEX has sufficient awareness that the goods it sells at its stations originate from the United States such that Alimport's role as a third party does not preclude finding direct effects caused by CIMEX. The district court did not engage in that kind of analysis, though, and we again leave it to that court to conduct the inquiry in the first instance.

\*    \*    \*    \*    \*

For the foregoing reasons, we vacate the district court's denial of CIMEX's motion to dismiss and remand for further proceedings consistent with this opinion.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting:

In February 1996, the Cuban military shot down two small civilian planes on a humanitarian mission off the coast of Cuba. Three U.S. citizens and one permanent U.S. resident from Cuba were killed. Outraged, Congress passed and President Clinton signed into law the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996. Pub. L. No. 104-114, 110 Stat. 785 (codified at 22 U.S.C. §§ 6021 *et seq.*).

Passage of this legislation established a *specific*, *independent*, and *exclusive* cause of action for American nationals whose property the Cuban government had confiscated decades earlier. The liability of those trafficking in such property does not depend on the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*. The majority holds otherwise. I therefore dissent.

In 1960 the Cuban government, then under Fidel Castro, issued an edict nationalizing all "property and enterprises . . . owned by the juridical persons who are nationals of the United States." *See Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845, 849 (2d Cir. 1962) (quoting Exec. Power Resol. No. 1 (1960), Cuba), *rev'd*, 376 U.S. 398 (1964); *see also* 22 U.S.C. § 6081(3). At the time U.S. nationals "either owned or held significant investments in Cuba's electric company, its telephone system, a wide variety of mining operations, the petroleum sector, hotels, sugar and other agricultural products," and more. David Kaye, *The Helms-Burton Act: Title III and International Claims*, 20 HASTINGS INT'L & COMP. L. REV. 729, 730 (1997).

Four years later, in 1964, Congress responded with the Cuban Claims Act, authorizing the U.S. Foreign Claims Settlement Commission to determine the amount and validity of "claims by nationals of the United States against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property . . .

2

owned wholly or partially, directly or indirectly" by U.S. nationals "at the time" of the taking. Pub. L. No. 88-666 § 503(a), 78 Stat. 1110, 1110-11 (1964) (codified as amended at 22 U.S.C. § 1643b(a)). The Commission ultimately certified $1.9 billion in claims.

With respect to Exxon's claim, the Commission determined, "in accordance with applicable substantive law, including international law,"[1] that Exxon (then called Standard Oil) had suffered a loss of $71,611,002.90 resulting from Cuba's confiscation of all property in Cuba held by Exxon's wholly-owned subsidiary. *See* Standard Oil Co., F.C.S.C. Decision No. CU-0938, Claim No. CU-3838, at 9 (Sept. 3, 1969). The Commission certified Exxon's claim in that amount, plus annual interest of 6 percent beginning on July 1, 1960, "to the date of settlement." *Id.* at 10.

But in the decades after Castro's seizure of property, U.S. claimants like Exxon had no effective means of obtaining compensation. Title III of the LIBERTAD Act in 1996 filled that gap. Title III created a cause of action; required courts to accept the Commission's certification of a claim as "conclusive proof of ownership of an interest in property"; and provided federal courts with a jurisdictional basis for such actions by stripping Cuban instrumentalities of sovereign immunity. 22 U.S.C. §§ 6082, 6083(a)(1).

Title III's civil remedy is against those who "traffic[]" in the confiscated property. 22 U.S.C. § 6082(a)(1)(A). Its purpose was not only "to provide protection against wrongful confiscations" of the property of U.S. nationals, *id.* § 6081(10),

---

[1] 22 U.S.C. § 1643b(a). See also 22 U.S.C. § 1623(a)(2)(B), which requires the Commission to apply the "applicable principles of international law, justice, and equity."

3

but also to discourage "transactions involving [this] confiscated property, and in so doing to deny the Cuban regime the capital generated by such ventures." H. Rep. No. 104-202, pt. 1, at 39 (1995); *see also* 22 U.S.C. §§ 6022, 6081(6). After a series of suspensions, *see* 22 U.S.C. § 6085(b), Title III finally went into effect on May 2, 2019.[2] Exxon filed its lawsuit on the same day.

The question raised in this appeal is framed as whether there is subject-matter jurisdiction over Exxon's suit. The majority holds that the Foreign Sovereign Immunities Act (FSIA)—not Title III—provides the answer. As a result, unless Exxon satisfies one of the exceptions to foreign sovereign immunity in the FSIA, the defendants, as instrumentalities of Cuba, are "immune from the jurisdiction" of federal and state courts. 28 U.S.C. § 1604.

That mistaken conclusion rests in large measure on Supreme Court opinions stating, in one way or another, that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Majority Op. at 8–9 (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 30 (2015)) (emphasis omitted). It is true that the Supreme Court and this court have repeatedly referred to the exclusive nature of the FSIA. But in each case Title III did not apply for at least one of three reasons. One, it did not exist at the time. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Two, it was not in effect because the President had suspended its cause of action. *Sachs*, 577 U.S. at 30; *Republic*

---

[2] Title III authorizes the President to suspend its provisions for renewable six-month periods if he determines that suspension would advance U.S. interests and expedite a transition to democracy in Cuba. 22 U.S.C. § 6085(b)–(c). Beginning with President Clinton, each President continually suspended Title III, until President Trump let the suspensions lapse.

4

*of Austria v. Altmann*, 541 U.S. 677, 699 (2004). Or three, the plaintiffs' claims did not arise out of or relate to Cuba's confiscations. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023); *Doe v. Taliban*, 101 F.4th 1, 10 (D.C. Cir. 2024); *Simon v. Republic of Hungary*, 77 F.4th 1077, 1090 (D.C. Cir. 2023), *cert. granted*, No. 23-867, __ S. Ct. ___, 2024 WL 3089537, at *1 (U.S. June 24, 2024); *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 690 (D.C. Cir. 2022); *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020).

Not one of these opinions mentions Title III. When "questions of jurisdiction" are "passed on in prior decisions sub silentio," a later court is not "bound when a subsequent case finally brings the jurisdictional issue before [it]." *Hagans v. Lavine*, 415 U.S. 528, 535 n.5 (1974). And in one of the leading cases the majority invokes, the Supreme Court stated what should be obvious—that "general language" in its opinions should not be applied to "quite different circumstances that the Court was not then considering." *Turkiye Halk Bankasi A.S.*, 598 U.S. at 278 (citation omitted); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.) ("If [general expressions] go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."). Thus, decisions dealing only with jurisdiction under the FSIA without considering Title III cannot possibly control the issue posed in this case. *See, e.g.*, *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

As to that issue and contrary to the majority's view, Title III is an *exclusive* and *independent* remedy in no wise dependent upon the FSIA.

5

Title III, considered alone, deprives the Cuban defendants of immunity from suit. Here are the words: "any person that . . . traffics in property which was confiscated by the Cuban government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages." 22 U.S.C. § 6082(a)(1)(A). "[P]erson" is defined to include "any agency or instrumentality of a foreign state." *Id.* § 6023(11).

The Supreme Court has held that nearly identical statutory language waives the sovereign immunity of the U.S. government. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 50 (2024); *see also Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 729 (D.C. Cir. 2021) (same). In *Kirtz*, the Court interpreted the Fair Credit Reporting Act (FCRA), a consumer protection statute. 601 U.S. at 45. Two provisions were relevant to its analysis. *Id.* at 50–51. First, the FCRA imposes civil liability on "[a]ny person" who willfully or negligently fails to comply with the statute's provisions. 15 U.S.C. §§ 1681n(a), 1681o(a). Second, the FCRA defines "person" to "mean[]," among other things, "any . . . government or governmental subdivision or agency." *Id.* § 1681a(b). With those two provisions, the Court held, "Congress has explicitly permitted consumer claims for damages against the government." 601 U.S. at 51. Dismissing such actions on immunity grounds would "effectively negate suits Congress has clearly authorized." *Id.* (internal quotation marks and alteration omitted).

Title III establishes that "any person," including "any agency or instrumentality of a foreign state," that traffics in expropriated property confiscated by the Cuban Government *"shall be liable"* to U.S. nationals with claims to that property. 22 U.S.C. §§ 6023(11), 6082(a)(1)(A) (emphasis added). Compare that language with the FCRA's: "Any person,"

6

including "any . . . government or governmental subdivision or agency," that violates the statute's requirements "*is liable* to th[e] [affected] consumer." 15 U.S.C. §§ 1681a(b), 1681n(a), 1681o(a) (emphasis added).

There is scarcely a difference between the two statutes in terms of language or function. Both impose civil liability on any "person." And both define "person" to include governmental instrumentalities.[3] The Supreme Court has ruled that legislation of the 1996 Congress—which enacted both the FCRA's cause of action and Title III—"explicitly" abrogated the sovereign immunity of the United States. *See Kirtz*, 601 U.S. at 46–47, 51. And yet, according to the majority opinion, the same Congress in the same Session using the same language did not bring about the same result with respect to Cuban agencies. *See* Majority Op. at 13–14. Put aside for the moment the obvious disconnect—that Cuban agencies enjoy more protection from

---

[3] The majority characterizes Title III as exposing all "foreign states" to potential liability. Majority Op. at 14. This is doubly mistaken. Title III does not allow suits against Cuba or any other foreign state. It applies only to agencies and instrumentalities of foreign states. *See* 22 U.S.C. §§ 6023(1), (11), 6082(a)(1)(A); 28 U.S.C. § 1603(a)–(b). In addition it is fanciful to suppose that nations other than Cuba would "traffic[]" in property that the Cuban government confiscated. *See* 22 U.S.C. § 6082(a)(1)(A). Such a possibility is so remote as to be effectively nonexistent. It comes as no surprise that the parties have identified no instance in which Cuba has sold or transferred confiscated property to another foreign sovereign's instrumentality that then trafficked in that property. *Exxon Mobil Corp. v. Corporación Cimex S.A.*, 567 F. Supp. 3d 21, 27 n.3 (D.D.C. Oct. 8, 2021) ("The court has been given no reason to believe that any nation other than Cuba could be subject to a Title III claim. Neither party has identified any instance in which Cuba has sold expropriated property to another sovereign that now 'traffics' in that property."). Nor has any such Title III action yet been filed.

7

lawsuits than agencies of the United States, which would be a shock. Rather, consider the legal principle underlying the majority's analysis—unheard of until now—that Congress must make an *ultra-clear* statement to abrogate foreign sovereign immunity. That principle has no support. Like statutes are to be treated alike. Title III thus functions as both a cause of action and an abrogation of immunity. *Cf.* 22 U.S.C. § 6082(d) (specifically discussing the enforceability of Title III judgments against Cuban instrumentalities).

Title III is also *specific* in comparison to the FSIA. The majority decides that if Title III is inconsistent with the FSIA, the FSIA controls. Majority Op. at 8–14. That has it upside-down. The time-honored canon of statutory construction is that when two statutes are at odds, the specific prevails over the general. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183–88 (2012).

Title III is specific, the FSIA is general. Title III applies only to Cuba's confiscations of property. The FSIA applies to all nations. *Compare* 22 U.S.C. § 6082(a)(1)(A), *with* 28 U.S.C. §§ 1330, 1604(a), 1605(a). Under Title III only U.S. nationals may bring an action.[4] Under the FSIA anyone may sue, including aliens. *Compare* 22 U.S.C. § 6082, *with* 28 U.S.C. §§ 1330, 1605. Title III only authorizes actions in which the

---

[4] A U.S. national "that brings an action under" Title III "may not bring any other civil action" dealing with "the same subject matter" under "Federal law." 22 U.S.C. § 6082(f)(1)(A). FSIA suits are necessarily "under" federal law. *See, e.g.*, *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 185–86 (2021); *Saudi Arabia v. Nelson*, 507 U.S. 349, 354, 363 (1993).

8

amount in controversy exceeds $50,000, while FSIA claims have no minimum.  *Compare* 22 U.S.C. § 6082(b), *with* 28 U.S.C. § 1330(a).[5]

There is yet another stark conflict between Title III and the majority's application of the expropriation exception in the FSIA.  The majority concludes that the FSIA's expropriation exception does not apply because, under international law, the property Cuba confiscated was owned not by Exxon but by its subsidiary.  Majority Op. at 16–22.  But in Title III actions, "the court shall accept" claims certified by the Foreign Claims Settlement Commission "as conclusive proof" of violated property rights.  22 U.S.C. § 6083(a)(1).

This is an action under Title III.  *See* J.A. 18–20, 47–48.  The Commission, which considered international law, determined that Cuba illegally took Exxon's rights in property worth more than $71 million.  The statute instructs the courts to treat Exxon's ownership of an interest in that property as "*conclusive*." 22 U.S.C. § 6083(a)(1) (emphasis added).  Yet in defiance of that statutory mandate, the majority completely disregards the Commission's certification.

The majority also disregards the congressional findings and statements of purpose in the LIBERTAD Act.  Such legislative pronouncements are important in determining a statute's meaning and scope.  *See, e.g.*, *Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023); Scalia & Garner, *supra*, at 35, 217–20.  In the Act, Congress not only condemned Cuba's confiscations, 22 U.S.C. § 6081(2)–(3); *see also id.* § 6021, but also declared that the Act's purpose was "to protect United States nationals against

---

[5] Title III suits are brought under 28 U.S.C. § 1331 (federal question), *see* 22 U.S.C. § 6082(c)(1), while suits under the FSIA are brought under 28 U.S.C. § 1330 (actions against foreign states).

9

confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." *Id.* § 6022(6); *see also id.* § 6022(3). "To deter" that trafficking, Congress concluded that "United States nationals who were the victims of these confiscations should be endowed with a judicial remedy." *Id.* § 6081(11). Yet "[t]he international judicial system, as currently structured lacks fully effective remedies for the wrongful confiscation of property and for unjust enrichment . . . at the expense of the rightful owners of the property." *Id.* § 6081(8). The FSIA was part of that system. Congress expressly determined that Cuba's wrongful takings required a remedy beyond what was then available. *See* 22 U.S.C. § 6081(2). That remedy is Title III, unencumbered by the FSIA.

One thing more. As the majority points out, some FSIA provisions do apply to Title III actions. Majority Op. at 11–12 (citing 22 U.S.C. §§ 6023(1), (3), 6082(c)(2) and 28 U.S.C. § 1611(c)). But they have no effect on the outcome of this case. For example, Title III incorporates the FSIA's procedures for service of process. 22 U.S.C. § 6082(c)(2). There would be no need for such a provision if Congress understood the FSIA to apply to Title III *in toto*. For another example, the LIBERTAD Act amended the FSIA (28 U.S.C. § 1611(c)) to provide that Cuban "diplomatic" "property" will not be subject to attachment and execution. The amendment dealt only with what property may satisfy a judgment in a Title III action. Threshold immunity for a defendant is a quite different matter. *See, e.g.*, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983); *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 205 (2018). The amendment to the FSIA's execution provision therefore has nothing to do with Title III's separate provisions depriving Cuban instrumentalities of a sovereign immunity defense.

Nor is it compelling that Congress could have stated more clearly that jurisdiction under Title III does not depend on the

10

FSIA.  *Contra* Majority Op. at 11.  Just because "Congress knows how to say thus and so" does not mean it necessarily "would have written thus and so if that is what it really intended." *Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003).  Congress "almost always" could write a provision more clearly.  *Id.*

Because Title III abrogates the defendants' sovereign immunity, I would not decide whether the Foreign Sovereign Immunities Act does so as well.